## BREWTON *vs.* SMITH AND WIFE.

1. A deed, though void, may be a cloud over the true title; and, therefore, a bill will lie, to have it delivered up to be cancelled.
2. K. made a deed in which he said, "I give and bequeath the aforesaid slaves to the said Ebaline Sikes and any other child or children which I may hereafter have." K. had children born afterwards. These filed a bill, and prayed that the deed might be so reformed as to make it convey their interest to *a trustee* for them,—alleging, in the bill, that such trustee was left out of the deed, by ignorance of law in the donor or his scrivener. *Held,* That the bill lay.

Brewton vs. Smith and Wife.

In Equity, in Tatnall Superior Court. Decision on demurrer by Judge FLEMING, May, 1859.

This was a bill filed by Benjamin Brewton as the administrator, *cum testamento annexo*, of Edward Kennedy, deceased, late of Tatnall county, and as the next friend of the infant children of deceased, against William Smith and Ebaline, his wife. The object of the bill was to enjoin an action at law and to reform certain deeds executed by the said Edward Kennedy in his lifetime.

The bill alleges that plaintiff departed this life possessed of considerable property, consisting of land and negroes, leaving his last will and testament; that the persons therein appointed executors refusing to qualify, complainant was appointed administrator with the will annexed, and took possession of the estate. That he took possession of the following negroes of which deceased died possessed, to-wit: Ann and Lydia and their children, and others, and that an action of trover has been instituted against him by Smith and wife for the recovery of the first named negroes, to-wit, Ann and Lydia and their children. That Smith and wife claim said negroes under the following deeds, which, they allege, were executed by said Edward Kennedy at the times they respectively bear date, viz:

State of Georgia, } *To all whom these presents shall come,*
Tatnall County, } *Greeting:*

I, Edward Kennedy, sen., of the county and State aforesaid, for and in consideration of the good will and affection which I have to my illegitimate daugter Ebaline Sikes, of the age of one year and five or six months old, hath given, and by these presents doth give and bequeath to her, the said Ebaline Sikes, a certain negro woman named Ann, and her child Lydia, and all her increase, I give and bequeath the aforesaid slaves to the said Ebaline Sikes, and any other child or children which I may hereafter have by my wife Charlotte Kennedy; and I do fur-

ther give unto the said Ebaline Sikes, one bed and furni-
ture to herself alone, to the only proper use and benefit
of them, the said Ebaline Sikes and the other heirs which
I may hereafter have by my present wife, Charlotte Ken-
nedy, their heirs, executors and administrators forever.
In testimony whereof, I, the said Edward Kennedy, hath
hereunto set my hand and seal, this twenty-third day of
July, in the year of our Lord eighteen hundred and thirty-
eight.

his

EDWARD ⋈ KENNEDY, [L.S.]

mark.

Signed and acknowledged in the presence of us.

SHADRICK HANDCOCK.

WM. W. TIPPINS, J. P.

State of Georgia,   }  *To all whom these presents shall come,*
  Tatnall County.  }   *Greeting:*

I, Edward Kennedy, sen., of the county and State afore-
said, for and in consideration of the good will and affec-
tion which I have to my illegitimate daughter Ebaline
Sikes, about four years old, and my daughter Dica Ken-
nedy, about two years and six months old, and my son
Alford Kennedy, about fifteen months old, and any other
children which I may have by my present wife, Charlotte
Kennedy, hath given, and by these presents doth give
and bequeath to them, the said Ebaline, Dica, and Alford,
and any other children I may have by my present wife,
Charlotte Kennedy, in equal interest, (a certain lot of
money, to-wit: five hundred and fifty dollars, placed in
the place of) a certain negro girl named Harriet, about
fifteen years old, and her increase, if any, and one-half of
my stock of horses and cattle, and stock of all descrip-
tion, and household and kitchen furniture, and working
tools which may be left at my death, to be divided at my
death; if I should live until my sons Eli and Hampton

should arrive to the age of twenty-one years, and if I should before my sons Eli and Hampton should arrive at the age of twenty-one years, as I have left the other part of my stock and household furniture to them, to have and to hold the said negro girl Harriet and her issue, and the said stock, household and kitchen furniture and working tools, to the only proper use, benefit and behoof of them, the said Ebaline Sikes, Dica Kennedy and Alford Kennedy, and any other children which I may have by my present wife, Charlotte Kennedy, their heirs, executors or administrators forever. In testimony whereof, I the said Edward Kennedy, sen., hath hereunto set my hand and seal, this twenty-fifth day of March, in the year of our Lord eighteen hundred and forty-one.

his

EDWARD ⋈ KENNEDY, [L.S.]

mark.

Signed and acknowledged in the presence of us.

GEORGE M. E. TIPPINS.

WM. W. TIPPINS, J. I. C.

Georgia,⎫ Know all men by these presents,
Tatnall County.⎭ that I, Edward Kennedy, of said State and county, for and in consideration of the natural love and affection which I have and bear to my several children, viz: Ebaline Sikes, my illegitimate daughter, Dica Kennedy, Alford Kennedy, Cynthia Kennedy, Charlotte Kennedy, Raiford Kennedy, Mahala Kennedy, Martin Kennedy, and Sarah Kennedy, and also any other child or children which I may hereafter have, by my present wife Charlotte Kennedy, all of the same place, do by these presents give and grant, unto my said children, a certain negro woman named Hannah, about fifteen years old, to have and to hold the said negro woman to them the said children as aforesaid, their heirs and assigns forever. In testimony whereof, I have hereunto set my

hand and affixed my seal, this eleventh day of June, one thousand eight hundred and forty-nine.

his
EDWARD ⋈ KENNEDY, [L.S.]
mark.

Signed, sealed and delivered in presence of us.

MICHAEL M. EASON.
JOSIAH P. R. SIKES.
DANIEL SIKES.

Georgia,        }    In person appeared before me Samuel D. Surrency, a Justice of the Peace, in and for said county, Michael M. Eason, who being duly sworn, saith he saw Edward Kennedy sign the within deed, for the purposes therein mentioned; and further saith he saw Josiah P. R. Sikes and Daniel Sikes sign it also as witnesses.      M. M. EASON.

Sworn to and subscribed before me, this 3d September, 1849.      SAMUEL D. SURRENCY, J. P.

The bill further alleges, that at the time the first deed purports to have been executed, Edward Kennedy had no legitimate child or children, but had only an illegitimate daughter, Ebaline Sikes, now Mrs. Smith, mentioned in said deed. That when the second deed was made Kennedy had two legitimate children, Dica and Alford, and at the time the third and last deed was executed, he had the following legitimate children, being, to-wit; Dica, Alford, Cynthia, Charlotte, Raymond, Mohala, Martin, and Sarah; and afterwards he had another child, Caroline; and that all of said children survived their father. That William Smith intermarried with the said Ebaline, the illegitimate daughter mentioned and provided for in said deeds, and claims under the *first* deed all the negroes therein mentioned, with their increase, and under the second and third deeds he claims a proportion of the property therein mentioned, excluding all the children

Brewton vs. Smith and Wife.

born after the date of said deeds respectively, from any share or interest therein.

The bill further states that the action of trover came on and was tried at March Term, 1858, when, under the charge of the court, plaintiffs in said action, Smith and wife, obtained a verdict for all the negroes mentioned in said first deed, from which verdict complainant appealed, and which is now pending in the Superior Court.; and that Smith and wife are threatening to bring suit against complainant for the property in the second and third deeds, or their share or proportion thereof as aforesaid.

The bill charges that Kennedy was an uneducated and ignorant man, and unable so write, and that the aforesaid deeds were prepared and drawn up by persons unlearned, who had no knowledge of law, and that the intention of Kennedy was to retain possession of said property and deeds until his death, and that then all his legitimate children, together with the said Ebaline, were to share the same equally; and said conveyances were never delivered during his lifetime, but were in his possession at the time of his death.

The prayer of the bill is, that Smith and wife be enjoined from further proceeding with their action at law, and that said conveyance be reformed so as to express the true and real intentions of the donor, and that the said Ebaline be decreed to receive only an equal share of said property with the lawful children of said Kennedy.

The following is a copy of the last will and testament of Edward Kennedy, attached as an exhibit to complainant's bill, viz:

Georgia,
Tatnall county. } In the name of God, AMEN:

I, Edward Kennedy, of said State and county, being of advanced age, and knowing that I must shortly depart from this world, deem it right and proper both as respects myself and my family, that I should make a disposition

of my property and do make and ordain this my last will and testament, hereby revoking and annulling all other wills made by me and particularly revoking a conveyance of property which was to go into effect at my death, which bears date the twenty-fifth day of March, eighteen hundred and forty-one, recorded in 2d book D., page 196, 1st May, 1841, which deed conveys certain property at my death to my two sons, Eli and Hampton, and which said deed is hereby revoked and pronounced null and void.

First. I desire my body to be interred in a decent and christian-like manner suitable to my circumstances and condition.

Second. I desire all my just debts to be paid without delay.

Third. I give and bequeath unto my beloved wife, Charlotte Kennedy, during her natural life, three hundred acres, lying in Tatnall county, Georgia, known as the Damper old place, originally granted to James Hancock, and after her death to go to my son Raiford Kennedy; and I further give to my said wife all the bedding and household furniture which she owned at the time of our intermarriage, to be entirely at her disposal; and is further my will that my wife shall remain upon the plantation which I may be in possession of and occupying as my house at the time of my death, and be supported out of my estate, with all the children which may be minors at the time of my death, until my youngest child shall attain the age of twenty-one years, or so long as she may remain my widow, and conduct herself properly in the opinion of my executors, reserving to my executors the entire control of my whole estate, and should it appear at any time that my wife is mismanaging or wasting the estate, then it is my will that my executors immediately discharge her from all further management and control, and I hereby appoint my executors guardians to my minor children, with full control over said minors in

case they deem it necessary on account of any improper conduct on the part of my wife.

Fourth. It is my will that my son Alexander Kennedy, my daughter Sarah Duke, my son Edward Kennedy, my son Henry Kennedy, my daughter Witthy Ann Stubbs, my son William Kennedy, my daughter Miriam Strickland, my son Solomon Kennedy, and my daughter Elizabeth Surrency, have no more of my estate than the property which I have already given them.

Fifth. Whereas, on the eighteenth day of January, eighteen hundred and thirty-three, I conveyed by deed to my two sons, Eli Kennedy and Hampton Kennedy, two negro slaves Isham and Tena, which deed of conveyance is on record in Tatnall county, in book D., page 75, and also by another conveyance, deeded to them two negro men Bryant and Morris, and my land and plantation where I now live, and all my lands on the north side of Thomas' creek, which conveyance is recorded in said county, in book D., page 11, and bears date 23d July, 1838, I now will and bequeath to my said son Hampton, (my son Eli being now dead,) one-half the property as above conveyed, being the half to which he is entitled under the above named conveyance; also I will and bequeath to my said son, one bed and furniture, one horse, saddle and bridle, and twenty head of stock cattle: Provided, that any portion of the above named property which I may give up to him before my death is to be considered as an advance made him, and to be deducted from the above after my death.

Sixth. All the rest of my property which I may leave at my death, of whatsoever kind, whether real or personal, and all my money in hand, and all debts which may be due at my death, I will and bequeath to my illegitimate daughter Ebaline Sikes, and the children I now have or may hereafter have by my present wife, Charlotte, all share and share alike, to be divided when the

29

youngest child shall attain the age of twenty-one years. My executors, however, are authorized, in their discretion, to loan to each one of the children, as he or she may come of age, a portion of the property for his or her support.

Seventh. I appoint my son Solomon Kennedy and my friend James P. Daniel, executors to this my last will and testament.

In witness whereof, I, Edward Kennedy, do hereto set my hand and seal, and publish this as my last will and testament.

his

EDWARD ⋈ KENNEDY, [L.S.]

mark.

Signed, sealed and published by Edward Kennedy as his last will and testament, on the nineteenth day of October, 1850, in presence of us.

EVERETT M. G. STUBBS.

HENRY KENNEDY.

E. H. BACON.

The following admission and agreement was made and signed by the solicitors of the respective parties, to-wit :

B. BREWTON, next friend, &c.,  ⎫  Tatnall Superior Court,
  complainant, and            ⎬  March Term, 1859—Bill
WILLIAM SMITH and EBALINE,     ⎩  in Equity and prayer for
  his wife, defendants.        ⎭  injunction.

In the above case it is admitted on the part of the complainants that said grantor one month after the execution of the said deed, carried the same to the clerk of the Superior Court, telling him there was a deed, by which he had provided for his daughter Ebaline, and he wished it recorded. That said clerk recorded the same and handed it to grantor; that said Ebaline was of the age of one year and five or six months, at the time said deed was executed, and resided with her father, the grantor, at that time and continued to reside there until her marriage in 1853;

it is also agreed by defendants that the bonds usually given in injunction shall be waived, and it is agreed that this case be submitted to his honor, the judge of said court, upon bill and above agreed state of facts, and demurrer, and that same be argued by brief, and it is further agreed that said case be carried to Supreme Court at next term after his decision upon said demurrer is rendered, by consent.

WM. B. GAULDEN, compl's sol'r.

JOHN M. MILLEN, def'ts sol'r.

March 23rd, 1859.

Defendants demurred to the bill for want of equity, and Judge Fleming pronounced the following judgment, sustaining the demurrer and dismissing complainants' bill:

B. BREWTON, next friend, *et al.* ⎫ Tatnall Superior Court—
            *vs.*               ⎬ Bill for Injunction and to
WM. SMITH and wife.       ⎭ reform Deed—Demurrer.

This bill is filed to reform a deed and for injunction. The object of the injunction is to stop proceedings at law commenced for the recovery of certain negroes mentioned in the deed until the deed should be reformed and the reformation proposed would destroy the right to recover. Whether the injunction would be granted, then, depends upon the question whether the deed will be reformed.

The ground of the application to reform the deed as set forth in the bill is this: "That the said Edward Kennedy, at the time he executed said conveyance, was a man unlearned and unable to write—that he employed men unlearned, and who had little knowledge of law, to draw up said conveyance; that he intended to retain possession of said property and deeds until his death, and did retain possession of the same until his death—the property remaining in his possession and the deed found among his papers at his death, and that said conveyances were never delivered. That he failed by reason of the ignorance of himself and the party who drew up said deeds to appoint

a trustee to protect this property for the after-born children mentioned in said deeds, who were born and are named as heretofore mentioned. That it was the intention of said Edward to provide for said after-born children, as well as the said bastard, Ebaline, by said deeds of conveyance. That said William and Ebaline rely wholly and entirely upon said defective conveyance to maintain said action, and to deprive your Orator and Oratrixes of their just shares in said property. That at the execution of the first deed (the deed under which the action is brought,) the wife of the said Edward was pregnant with your Oratrix Dicy, and said Dicy, was born before said deed was recorded," &c.

In addition to the above allegations in the bill, the counsel have agreed upon the following facts, which of course must be considered as part of complainant's bill, viz: "That one month after the execution of the said deed, the grantor carried the same to the clerk of the Superior Court, telling him that there was a deed by which he had provided for his daughter Ebaline, and he wished the same recorded—that said clerk recorded the same and handed it to grantor—that said Ebaline was of the age of one year and five or six months at the time said deed was executed, and resided with her father, the grantor, at that time, and continued to reside there until her marriage in 1853. It is also agreed by defendants that the bonds usually given in injunction shall be waived, and that the cause be submitted upon the bill, and above agreed state of facts and demurrer, and that the same be argued by brief, and that said case be carried to the Supreme Court, at the next term after the decision upon said demurrer is rendered, by consent."

Upon the above state of facts, I am asked to reform the deed and grant injunction. If the allegation be true that the deed was never delivered, then there is no deed before me, and of course no deed to be reformed. Delivery

is essential to the perfection of a deed, and until delivery it is not executed, the grantee receives no title, for the grantor has parted with none.   What is there to reform ? Under such a state of facts, the idea of reformation is preposterous.   If the deed was delivered, then, upon a *proper case* made, it might be reformed, but for the purpose of this demurrer, am I at liberty to assume that the deed was delivered in the face of the allegation in the bill that it was never delivered ?   Is it competent for the complainants to abandon this allegation, and say that although the allegation is made, yet the facts agreed upon by counsel prove a delivery ?   I doubt if the complainants would be willing to take this position, for it would be giving up the principal ground of their defence to the action pending on the common law side of this court.   But I ask again, if they be willing can they do so ?   The allegation in their bill that the deed was never delivered, amounts to an allegation that the facts set out and agreed on do not prove a delivery.   If this be so, I repeat, there is no deed before me to be reformed.   This is the case *made* by the bill; can I decide this demurrer upon a case *not made* by the bill ?   I may think, and in point of fact I do think, that the deed was delivered—that the facts agreed upon prove the delivery, but I cannot act upon that opinion in the decision of this demurrer.   The question of delivery is not before me.   The bill alleges that the demurrer admits that the deed was never delivered.   This admission of course is for the purposes of this demurrer—it cannot extend beyond it, for if I were to overrule the demurrer the defendant would have the right to answer the bill and deny its allegations.   If he is not precluded in this very proceeding from denying what he now admits for the purposes of the demurrer, surely he will not be precluded from denying the same thing on the trial of the action at common law.   In other words, his demurrer now would not be evidence against him on the trial of the

common law action. So far as this bill seeks a reformation of this deed it is to my mind clearly demurrable.

And now what is the ground upon which the injunction is asked? The ground, if I understand the bill, is ˉthat the deed may be reformed. But no case for reforming the deed is made. Why then enjoin the party to have *that done* which, by the complainant's own showing *cannot be done*. I am the better satisfied with this conclusion, because, even if the bill had admitted the delivery, there would be no case for reforming the deed. This question is really not before me. I will not therefore argue it at length, but content myself with referring to one or two authorities. The reformation asked for is this, that the grantor *intended* to provide for after-born children, but did not do it in consequence of his own ignorance and the ignorance of the draftsman. The ignorance is this, that the grantor and his draftsman were both ignorant that a direct conveyance to persons not in being could not be made. The bill therefore asks that a trustee should be appointed that the *intention* of the grantor might be carried out. The case thus presented is a naked case of ignorance of law. The Supreme Court of the United States in the case of Hunt vs. Rousmanier, say: "The question then is, ought the court to grant the relief which is asked for, upon the ground of mistake arising from any *ignorance of law?* We hold the general rule to be that a mistake of this character is *not a ground for reforming a deed* founded on such mistake and whatever exceptions there may be to this rule, they are not only few in number, but they will be found to have something *peculiar* in their character."—1 Peters, 15.

"In courts of equity ignorance of the law shall not affect agreements, nor excuse from the legal consequences of particular acts."—Story's Eq. Juris., 126.

To express the same thing in different language; courts of equity will enforce a deed or agreement according to

Brewton vs. Smith and Wife.

its *legal effect*, no matter what may have been the inten-
tion of the parties, if the mistake arise from ignorance of
the law.   Mr. Story, referring to 3 Meriv. Reports, 195,
gives this illustration of the principle: "·So, when a par-
ty had a power of appointment,. and executed it absolute-
ly without introducing a power of revocation upon a mis-
take of law, that being a voluntary deed it was revocable,
relief was denied."   Here the party intended to reserve
to himself the power of revocation, but under a mistake
of law, that he had the power because it was a voluntary
deed, he did not reserve it in the instrument, and yet ef-
ect was given to the deed as *executed* and not as *intended*.
In the case before me the grantor *intended* to provide for
Ebaline Sikes, and his children hereafter to be born; in
ignorance of the law he makes a direct conveyance which
vests the whole interest in Ebaline, effect must be given
to this deed as *executed* and not as. he *intended*.   The fact
is that the party *intended* to make the *very deed* which he
did make—there is no allegation that he intended any
other deed, but he made it under a mistake of law, that
it would have a certain effect, such a mistake is not a
ground for reforming it.   Mr. Story, after examining the
-leading cases on this subject, says: "Without undertaking
to assert that there are none of these cases inconsistent
with the rule, ·it may be affirmed that the real exceptions
to it are very few, and generally stand upon some very
urgent pressure of circumstances."—Story's Eq. Jur., 156.
    Mr. Story adds: "In America, the general rule has
been recognized as founded in sound wisdom and policy,
and fit to be *upheld with a steady confidence.*   And hitherto
the exceptions to it (if any) will be found not to rest upon
the mere foundation of a naked mistake of law, however
plain and settled the principle may be, nor upon mere ig-
norance of title founded upon such mistake."   This re-
mark of Mr. Story will be found to be fully sustained
upon a close examination of the cases supposed to be ex-

ceptions to the rule. A close examination of those cases will show that in point of fact relief was granted, not on the ground of mistake in law, but that the mistake in law was only a *means of proving some other ground of relief.* The case of Lansdowne vs. Lansdowne, 1 Mosely, 364, is the only case to which this remark possibly might not apply. But even in that case the decision might well have been put on other grounds. The Supreme Court of the United States in Hunt vs. Rousmaniere, in commenting upon this case say : " Admitting for the present, the authority of this case, it is most apparent from the face of it that the decision of the court might well be supported upon a principle not involved in the question we are examining. The subject that the court had to decide arose out of a dispute between an heir-at-law and a younger member of the family, who was entitled to an estate descended, and this question the parties agreed to submit to arbitration. The award being against the heir-at-law, he executed a deed in compliance with it, but was relieved against it on the principle *that he was ignorant of his title* If the decision of the court proceeded upon the ground that the plaintiff was ignorant of the *fact* that he was the eldest son, it was clearly a case proper for relief. If the mistake was of his legal rights as heir-at-law, it is *not going too far to presume* that the opinion of the court may have been founded upon the belief that the heir-at-law was *imposed upon* by some unfair representation of his better informed opponent.

If this reasoning of the Supreme Court of the United States be correct, even the case of Lansdowne vs. Lansdowne is not an exception to the general rule. This reasoning satisfies me of another thing. If the case of Lansdowne vs. Lansdowne be an exception to the general rule it is not entitled to be respected as authority, why, otherwise, should such an effort be made to get rid of it.

The demurrer is sustained and the bill dismissed with costs.

W. B. FLEMING, Judge E. D. Ga.

J. M. MILLEN, for demurrer; W. B. GAULDEN, contra.

To which decision and judgment counsel for complainant excepts, and assigns the same as error.

WM. B. GAULDEN, for plaintiff in error.

JOHN M. MILLEN, and JOHN SCHLEY, contra.

By the Court.—BENNING, J., delivering the opinion.

The demurrer to the bill, was for want of equity. The court below sustained the demurrer. Therefore, the the question is, was there equity in the bill ?

1. The deeds were delivered, or they were not delivered.

1. First, if they were not delivered, was there equity in the bill ? We think that there was. The deeds, even if they were not delivered, make a cloud over the true title ; and, therefore, the owners of that title, are entitled to have them delivered up to be cancelled. It is true, that there is no special prayer adopted to this aspect of the case ; but, there is the general prayer, and it will answer the purposes ; or if it will not, a suitable prayer may be added to the bill by amendment, as matter of right, under the amendment act of 1854.

Secondly ; suppose that the deeds were delivered, was there, in that case, equity in the bill ?

In that case the bill becomes a bill to reform the deeds in a particular manner, that it may accomplish what it alleges, was the intention of the maker of them. Is the case made by the bill, one that will authorize a court of equity to require the deeds to be so reformed ?

The first of the three deeds is as follows : " I, Edward Kennedy, sen., of the county and State aforesaid, for and

in consideration of the good will and affection which I have for my illegitimate daughter, Ebaline Sikes, of the age of one year and five or six months old, hath given and by these presents doth give and bequath to her, the said Ebaline Sikes, a certain negro woman named Ann, and her child Lydia, and all her increase. I give and bequeath the aforesaid slave to the said Ebaline Sikes, and any other child or children which I may hereafter have by my wife Charlotte Kennedy; and I do further give unto the said Ebaline Sikes one bed and furniture to herself alone, to the only proper use and benefit of them the said Ebaline Sikes and the other heirs which I may hereafter have by my present wife, Charlotte Kennedy," &c.

The part of this deed which the bill alleges to be defective and to need amendment is the part which relates to after-born children.

The other two of the deeds contain similar provisions, as to after-born children.

The amendment which the bill alleges to be needed, is the addition to the deeds of a trustee for the after-born children, to hold the title for them, until their birth.

The grounds for reforming or amending the deeds in this way, are thus stated in the bill :

" That the said Edward Kennedy, at the time he executed said conveyance, was a man unlearned and unable to write—that he employed men unlearned, and who had litle knowledge of law to draw up said conveyance ; that he intended to retain possession of said property and deeds until his death and did retain possession of the same until his death—the property remaining in his possession and the deed found among his papers at his death, and that said conveyances were never delivered. That he failed by reason of the ignorance of himself and the party who drew up said deeds to appoint a trustee to protect this property for the after-born children mentioned

in said deeds, who were born and named as heretofore mentioned. That it was the intention of said Edward to provide for said after-born children, as well as the said bastard, Ebaline, by said deeds of conveyance. And to countenance such their unjust conduct, they make various pretences, all of which your orator charges to be untrue, and expressly charges that the said Edward by said conveyances, did intend to convey said property to his after-born children as well as to said bastard Ebaline, and was only prevented from so doing by the ignorance of law, of himself and the party who drew the conveyances."

Are the grounds thus stated in the bill sufficient to authorize equity to require the deeds to be so reformed?

According to these statements in the bill, the author of the deeds *intended* by them to convey the property to his "after-born children," "as well as" to his born child or children; and he "was only prevented from so doing by the ignorance of law, of himself and the party who drew up the conveyances;" "he failed, by reason of the ignorance of himself, and the party who drew up said deeds, to appoint a trustee to protect this property for after-born children." And, so far as these statements relate to the *intention* of the donor, they are true, beyond the possibility of question, for they are supported by the deeds themselves. It is perfectly clear, from the face of the deeds, that the intention of the donor was by deed to convey the property as well to his children to be born, as to his children born. In this respect the case has greatly the advantage over most cases for reforming written contracts. In most of those cases, the object is, to set up an intention different from that found on the face of the written contract. In this case, the intention found on the face of the deeds, (the contents,) is an intention, by those very deeds themselves, to convey property, as well to children to be born as to children born; and the

object of the bill is, to make the deeds such, that they shall carry out this very intention. Such, in a word, that they shall be able to accomplish their own clearly expressed wishes. This case, then, is free from the danger attending most cases of the sort; namely, that a court in undertaking to reform the contract, will substitute some contract of its own making for the contract of the parties making.

Why then should any change be made in the deeds? If they clearly express the donor's intention, in what can they be deficient? Children to be born are, of course, not born—are persons not in existence; and it is said that there is a general principle of law, that a conveyance to a person not in existence, is void, unless made to a trustee for that person, to hold the property till he comes into existence. Hence, the bill concedes the deeds to be defective in the want of a trustee for the after-born children; and consequently, it prays that one may be added to the deeds. Now the interposition of a trustee in such a case, is obviously, a matter of the merest technical form; therefore, ignorance that the law requiring such a trustee, ought to be a sufficient ground to justify equity in supplying one, if ignorance of the law is sufficient to justify the interposition of equity in any case. And ignorance of the law is a sufficient ground to justify the interposition of equity in some cases. The case of Wyche and wife vs. Green, (16 Ga. 47,) is one. In that case, the bill stated, "that by a mistake of the said Batt Wyche, in the use of words not proper and technical for the conveyance of such meaning," (the one sought to be substituted,) "the said intentions of the said Batt Wyche, failed to be equally" [fully] "expressed therein."—*Ib.* 53. This is but saying that Wyche, from not knowing what were the proper and technical words necessary, failed to use them. And this court held the case to be one for the aid of equity. That is a far stronger case than this.

2. We think, then, that this is a case in which a court of equity would be authorized to require the deeds to be reformed, by the interposition of a trustee for the after-born children, to take the property intended for them until their birth. And, therefore, we think that there *was* equity in the bill, in this, its second aspect.

It is to be borne in mind, however, that this is a case in which counsel on both sides agree that a trustee is necessary to the deeds in order to make them sufficient to effectuate the donors intentions as to the after-born children. This being so, this court is not bound to look into the question, whether the counsel are right in this particular or not; but it may, so far as the present case is concerned, act on the assumption that they are right, and that a trustee is necessary to the deeds in order to make them sufficient to convey an interest to the after-born children.

I must, however, say for myself, that in my opinion, the deeds are quite sufficient as they stand, to effectuate the whole intention of the testator; and therefore, that, in my opinion, a trustee was not necessary.

Take the first deed. That is a deed in which the words of gift are, " I give and bequeath the aforesaid slaves to the said Ebaline Sikes, and any other child or children which I may hereafter have by my wife Charlotte." Here the intention plainly was, that his child, Ebaline, should have the whole interest, provided he did not have other children born to him ; but if he did, then that such children should share in the interest equally with Ebaline. This being the intention, the words he used may be taken as equivalent to these words: " I give the whole interest in said slave to my child Ebaline, *on condition*, nevertheless, that if I should hereafter have other children, a part of that interest shall pass from her to them ; viz : such a part that the effect shall be, to make her and them take each an equal interest in the slaves." And here we have but

the common case of an estate *on condition*—the case of the whole interest conveyed to one subject to be divested in whole or in part on the happening of a subsequent event. The whole interest is conveyed to the child Ebaline, subject to be divested from her, as to a part, on the birth of another child, and vested, as to that part, in that child; and the whole interest is, then, to be in the two children, subject to be divested from them, as to a part, on the birth of a third child, and vested as to that part in that child; and so on, as often as a new child may be born.

Now such a conveyance as this, is, I think, not only valid, but of not uncommon occurrence. The law permits an estate of any quantity of interest, even the greatest, to be conveyed on condition; as " an estate to a man and his heirs, *tenants of the manor of Dale,*" which " is an estate on condition that he and his heirs continue tenants of that manor;" an estate in fee simple on condition that rent be paid.—2 Black. Com. 154; see too, Comyn. Dig. "Estate in fee simple," (A. C.) and note *d,* where a number of cases are collected.

In my opinion, then, these' deeds are quite sufficient as they are, and need no mending; still, for the reason aforesaid, viz, that the counsel on both sides take a different view, I acquiesce in the conclusion above announced, so far as this case is concerned.

Judgment reversed.